**United States District Court for
the District of Maryland**

| | |
|---|---|
| **United States** | |
| **v.** | **No. 1:22-cr-141-ELH** |
| **Brandon Jackson** | |

**Motion to Dismiss the Indictment Under
the Second Amendment**

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association, Inc.*

*v. Bruen*, 142 S. Ct. 2111 (2022), upended Second Amendment law. Before *Bruen*, courts

decided Second Amendment challenges by balancing the strength of the government's interest

in firearm regulation against the degree of infringement on the challenger's right to keep and

bear arms. *Bruen* rejected that approach, instructing courts, instead, to consider only

"constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text

covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects

that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a

challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The test for historical consistency is demanding: a firearm regulation is consistent with

American tradition only if similar regulations were widespread and commonly accepted in the

founding era, when the Second Amendment was adopted.

1

Under the new framework mandated by *Bruen*, the Court should dismiss the one-count indictment against Brandon Jackson, which charges him with possessing a firearm while under felony indictment, in violation of 18 U.S.C. § 922(n). Because Mr. Jackson's possession of a firearm comes within the Second Amendment's "plain text," his conduct is presumptively protected. And the government will be unable to rebut that presumption, as laws disarming felony indictees were unknown to the generation that ratified the Second Amendment. This Court should join the multiple courts to hold, in light of *Bruen*, that § 922(n) violates the Second Amendment, and should therefore dismiss the indictment. *See United States v. Quiroz*, No. PE:22-CR-00104-DC, --- F. Supp. 3d ---, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *United States v. Stambaugh,* No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022).[1]

## I.    Procedural History

In December 2020, an officer with the Phoenix Police Department swore out a complaint against Mr. Jackson in Maricopa County Superior Court. Complaint, attached as Exhibit A. The complaint charged Mr. Jackson and a co-defendant with conspiracy to commit misconduct involving weapons, resisting arrest, first-degree hindering prosecution, and possessing a prohibited weapon (a rifle with a ten-inch barrel). Ex. A at 1-3. Under Arizona law, the latter offense is a Class 4 felony, ordinarily punishable by one-and-a-half to three years. Ex. A at 2; *see* Ariz. Rev. Stat. § 13-702(D). The Superior Court held an initial appearance on December 5, 2020, at which it released Mr. Jackson on his own recognizance pending trial. Final Release Order, attached as Exhibit B. The court did not impose any

---

[1] Unless otherwise indicated, case quotations in this motion omit citations, brackets, internal quotation marks, and other characters that do not affect the meaning of the cited language.

conditions that restricted Mr. Jackson's ability to possess or use firearms under Arizona law. On January 28, 2021, a grand jury returned an indictment charging Mr. Jackson with the same four counts contained in the complaint. Indictment, attached as Exhibit C.

On March 24, 2022, Mr. Jackson was at the Hagerstown Speedway to participate in a political protest. Statement of Probable Cause, attached as Exhibit D, at 2. That evening, Officer Koontz of the Maryland State Police responded to the scene following reports that a vehicle was blocking the entrance and exit to the Speedway. Officer Koontz was approached by a man, later identified as Mr. Jackson, who "began voicing his frustrations" with security at the protest. Ex. D at 2. When Officer Koontz asked whether Mr. Jackson had any guns on his person, Mr. Jackson said he did. Ex. D at 3. Mr. Jackson also said, in response to Officer Koontz's questions, that he did not have a Maryland permit to carry a firearm in public. Ex. D at 3. Officer Koontz and other officers eventually detained Mr. Jackson, searched him, and discovered a Smith & Wesson 9mm handgun in a holster on Mr. Jackson's thigh. Ex. D at 3.

On April 14, 2022, a federal grand jury returned a one-count indictment charging Mr. Jackson with violating 18 U.S.C. § 922(n). ECF No. 17. That statute makes it illegal for "any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." An "indictment" is defined to "include[] an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted." 18 U.S.C. § 921(a)(14).

## II.     Legal Background

### A.     Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, law and practice in the colonial and early-republic periods, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." 561 U.S. 742, 767 (2010). And that right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step

inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

**B.**   ***Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."**

The Supreme Court's recent opinion in *Bruen* disavowed the lower courts' framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this preliminary question in *Bruen* was straightforward. At issue there was a New York law providing that, to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protect[ed] [the

petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132.

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the

adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" entirely because it is too far removed from 1791).

The Court in *Bruen* held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow.

> **1.  Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.**

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that

problem is old or new. In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Id.* at 2131. The government can defend such statutes only by identifying a tradition of "distinctly similar" regulations from the founding era. *Id.* If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Id.*

In "other cases," a challenged statute will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Id.* at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Id.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are central considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis omitted).

This latter approach to *Bruen*'s historical inquiry—which the Court called "analogical reasoning," *id.* at 2132—is less difficult for the government to satisfy. But, critically, courts may employ that approach only when the challenged statute is geared toward a societal problem that was "unimaginable at the founding." *Id.* It is not available when the challenged

statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether it existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132.

### 2. The government must identify a "well-established and representative" tradition of comparable regulations.

Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." *Id.* at 2133; *see also id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic").

A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of those ten laws—which were most similar to New York's—as unrepresentative. *See id.* at 2148 n.24. Moreover, even if certain statutes were widespread in the founding era, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws, in part, because "respondents offer little evidence that authorities ever enforced [those] laws").

###   3.   The government bears the burden of demonstrating that a statute is consistent with the Nation's historical tradition.

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2130. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150.

And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

## III.   Argument

Under the framework announced in *Bruen*, § 922(n) on its face violates Mr. Jackson's Second Amendment right to keep and bear arms. Transporting a firearm across state lines qualifies as "keep[ing]" arms under the amendment's "plain text," and that text does not differentiate between felony indictees and other members of "the people." Accordingly, a total prohibition on transporting firearms by those under felony indictment presumptively violates the Second Amendment. The government will be unable to rebut that presumption. Mr. Jackson's research has not revealed any pre-20th-century laws disarming those under felony indictment. Thus there was no "historical tradition," as of 1791, of barring felony indictees

from possessing firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted. And even if § 922(n) is facially valid, its application to Mr. Jackson is unconstitutional, as neither his background nor the conduct alleged in his underlying felony case suggests he is violent or lacking in virtue.

    **A.**    **Section 922(n) is facially unconstitutional under the Second Amendment.**

        **1.**    **The Second Amendment's "plain text" protects Mr. Jackson's possession of a firearm.**

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The answer to that question is not difficult in Mr. Jackson's case. The Second Amendment's operative clause contains three textual elements: it protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." Here, Mr. Jackson satisfies all three elements.

The indictment charges Mr. Jackson with possessing a handgun. ECF No. 17 at 1. According to *Heller*, handguns are "the quintessential self-defense weapon," an item that falls comfortably withing the meaning of "Arms" for Second Amendment purposes. 554 U.S. at 629. Likewise, shipping and transporting that handgun, as the indictment alleges Mr. Jackson did, easily qualify as "keep[ing]" arms. *Heller* defined "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession"—in short, to "have weapons." *Id.* at 582 (citing founding-era dictionaries). That is exactly what Mr. Jackson allegedly did when he traveled with his firearm from Arizona to Maryland.

Finally, Mr. Jackson is part of "the people" within the meaning of the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a distinction

between people who are, and are not, under felony indictment. "Nothing in the Second Amendment's text" suggests that those who have been indicted for a felony are unentitled to the amendment's protection. *Id.*

*Heller* confirms this conclusion. Construing the words "the people" in that case, the Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580 (emphasis added). It interpreted "the people" to refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* Thus the Second Amendment right "is exercised individually and belongs to *all* Americans." *Id.* at 581 (emphasis added). Interpreting "the people" to exclude felony indictees would conflict with that principle.

In addition, *Heller* explained that "the people" is a "term of art" that bears a uniform meaning across a number of constitutional provisions, namely, the First, Second, Fourth, and Ninth Amendments. *Id.* at 580. The result is that, if a felony indictment deprives someone of his Second Amendment right to bear arms, it would also deprive him of his First Amendment rights to speak about matters of public concern and worship according to his faith, and his Fourth Amendment right to be free from warrantless searches of his home. That cannot be right. *See, e.g.*, *United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 WL 16858516, at *9 (W.D. Tex. Nov. 10, 2022) (striking down 18 U.S.C. § 922(g)(8), which bars firearm possession by people subject to intimate-partner restraining orders, and explaining that because such people "may invoke the protections of [the First and Fourth Amendments]," they may also invoke the protections of the Second); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) (concluding "the term 'the people' in the Second Amendment has the

same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community").

Notwithstanding this straightforward interpretation of the Second Amendment's "plain text," the government has argued in other post-*Bruen* litigation that "the people" includes only *law-abiding* citizens. *See, e.g.*, *United States v. Riddick*, No. 8:22-cr-57-TDC, ECF No. 55 at 4 (D. Md. Aug. 30, 2022). This argument derives from a comment the *Heller* Court made when determining the proper standard of review for Second Amendment claims. In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by the people." 554 U.S. at 634-35 (emphasis in original). The result is that judges lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Based on this latter sentence, the government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms. *See, e.g.*, *Riddick*, No. 8:22-cr-57-TDC, ECF No. 55 at 4.

This argument plainly misreads *Heller*. By beginning the quoted passage with "whatever else it leaves to future evaluation," the *Heller* Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too. Indeed, the Court expressly left that question "to future evaluation."

As one court has put it, *Heller* "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens *at the very least*." *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018) (emphasis added). That is, *Heller*'s "law-abiding" language does not "demarcate [the Second Amendment's] outer limit" or "exclude[]" anyone from the amendment's coverage, *id.*; it merely makes clear that certain people do fall within the amendment's reach. *See Perez-Gallan*, 2022 WL 16858516, at *8 (explaining that *Heller* "defined 'the people' as 'members of the political community,' not 'law-abiding, responsible citizens'"); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (concluding that even "dangerous felons" "are indisputably part of 'the people'" for Second Amendment purposes, notwithstanding their past violations of the law).

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity. The passage cited above references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." *Id.* If that passage were meant to mark off the outer edges of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, 142 S. Ct. at 2134, and the Court in *Bruen* gave no hint that it believed it was contradicting *Heller* in that regard. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

In other cases, the government has argued *Bruen* supports its view that only law-abiding citizens enjoy Second Amendment protection. *E.g.*, *Riddick*, No. 8:22-cr-57-TDC, ECF No. 55 at 4-5. It does so by noting that at several points, *Bruen* describes its holding by using the term "law-abiding." *See, e.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement

violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But *Bruen* repeated the "law-abiding" appellation because the petitioners in that case alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of *petitioners'* license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*, and at no point did the Court say Second Amendment rights are limited to law-abiding citizens.

Indeed, *Bruen* reaffirmed *Heller*'s conclusion that the Second Amendment right belongs to "'*all* Americans.'" *Id.* at 2156 (emphasis added) (quoting *Heller*, 554 U.S. at 581). That statement cannot be reconciled with the government's view that *Bruen* (implicitly) limits the arms right to law-abiding citizens. And *Bruen* repeated *Heller*'s instruction that courts should give "the Second Amendment's language" its "'normal and ordinary' meaning." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 576). There is nothing normal or ordinary about reading "the people" to mean "*law-abiding* people."

In any event, even if the "the people" excludes the non-law-abiding, that fact has no bearing on a challenge to § 922(n). "A person under indictment is presumed innocent and, until conviction, is not guilty of the charge that triggers the application of § 922(n)." *United States v. Call*, 874 F. Supp. 2d 969, 977 (D. Nev. 2012); *see also United States v. Love*, No. 20-20327, 2021 WL 5758940, at *3 (E.D. Mich. Dec. 3, 2021) ("And the fact of the underlying indictment does not make [a § 922(n) defendant] a criminal. Individuals charged with crimes are entitled to have their guilt or innocence determined based on evidence presented at trial, not on the grounds of suspicion, *indictment*, continued custody or other circumstances not

adduced as proof at trial." (emphasis in original)).

The presumption of innocence is both a moral and practical imperative. A "grand jury investigation is not an adversarial process"; the Supreme Court has held that "(1) the rules of evidence don't apply, (2) evidence barred by the Fourth Amendment's exclusionary rule may be heard, and (3) the grand jury may rely on evidence obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *United States v. Quiroz*, No. PE:22-CR-00104-DC, --- F. Supp. 3d ---, 2022 WL 4352482, at *10 (W.D. Tex. Sept. 19, 2022) (holding § 922(n) violates the Second Amendment) (citations omitted). At the time of indictment, a defendant "has not seen the evidence against him, or had the other protections of due process, including an opportunity to present his own version of events." *United States v. Laurent*, 861 F. Supp. 2d 71, 80 (E.D.N.Y. 2011); *see also Stambaugh*, 2022 WL 16936043, *5 (observing, in course of striking down § 922(n) under Second Amendment, that "the accused are entitled to neither notice of, nor an opportunity to be heard at, grand jury proceedings, so the accused never has a chance to contest their Second Amendment-rights-depriving status as an indictee"). The grand jury, moreover, "need not consider . . . exculpatory evidence." *Laurent*, 861 F. Supp. 2d at 88. As a result, the "great power and discretion vested in the grand jury . . . brings with it the potential for mistake and abuse." *Id.* at 89. Some commentators have even "criticize[d] the modern grand jury as no more than a 'rubber stamp' for the prosecutor," which "would indict a ham sandwich if asked to do so." *Id.* at 89-90.

Worse, some § 922(n) defendants do not receive even the minimal procedural protections of the grand jury before being indicted for an underlying felony. The "right to a grand jury indictment is not always applicable to state court proceedings," *Quiroz*, 2022 WL 4352482, at *11, and a defendant may be liable under § 922(n) even where his underlying

felony was charged by "information," *see* 18 U.S.C. § 921(a)(14). The result is that "a defendant indicted for a state felony could lose the right to buy a firearm [under § 922(n)] without the case ever reaching a grand jury." *Quiroz*, 2022 WL 4352482, at *11. Indeed, that is what happened in Mr. Jackson's case, where the state initially charged him by complaint and waited almost two months to obtain an indictment. For these reasons, courts have concluded that "for purposes of construing [§ 922(n)], a defendant under indictment is a 'law-abiding citizen' who remains eligible for Second Amendment protections." *Laurent*, 861 F. Supp. 2d at 102 (quoting *Heller*); *see also Call*, 874 F. Supp. 2d at 977 (same); *Stambaugh*, 2022 WL 16936043, *2 ("[C]ategorically deeming those indicted for felonies 'non-lawabiding and dangerous'—as the United States urges—is at odds not only with the presumption of innocence, but also with our system of pre-trial detention, where judges are tasked with making individualized determinations of dangerousness. Therefore, as a person who is presumed to be a law-abiding citizen until proven otherwise at trial, Stambaugh remains part of 'the people' whom the Second Amendment protects.").

Mr. Jackson, an American citizen, is part of the United States' "national community." *Heller*, 554 U.S. at 580. He is therefore among "the people" protected by the Second Amendment.

> **2.    The government will be unable to show that § 922(n) is consistent with the United States' "historical tradition of firearm regulation."**

Because "the Second Amendment's plain text covers [Mr. Jackson's] conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(n) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government will be unable to do so.

As explained above, the threshold question in *Bruen*'s historical inquiry is whether the

problem addressed by § 922(n) is longstanding or of more recent provenance. The answer is clear: courts have been releasing felony indictees on bail since before the founding. *See, e.g.*, Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 912 (2013) ("In state constitutions, from the Founding through the Nixon era, the right to bail was automatic and inalienable for all crimes not punishable by death. Even persons accused of capital crimes were entitled to bail as a matter of constitutional right unless the evidence of their guilt was great."); Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 337 (1982) ("Right to bail provisions existed in several colonial charters, indicating a widespread belief in a right to bail."); *Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present[,] . . . federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail."). Thus the "general societal problem" at which § 922(n) is directed—i.e., felony indictees' access to guns—"has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131; *see Stambaugh*, 2022 WL 16936043, *5 ("[T]he alleged societal problem addressed by § 922(n)—persons under indictment receiving firearms—has existed for the entirety of our Nation's existence.").

As a result, § 922(n) is unconstitutional unless the government shows a robust tradition of "distinctly similar" historical regulations as of 1791, when the Second Amendment was ratified. *Bruen*, 142 S. Ct. at 2131. The government cannot defend § 922(n) through "analogical reasoning," which is reserved for statutes aimed at "unprecedented" problems that would have been "unimaginable" at the founding. *Id.* at 2132. After all, the potential danger posed by felony indictees' access to firearms would hardly have been foreign to the Founders.

The government will be unable to carry its burden. What is today § 922(n) traces its

roots to the Federal Firearms Act of 1938. *Laurent*, 861 F. Supp. 2d at 82 (citing 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251). Under that statute, "individuals under indictment for, or convicted of, a crime of violence" were prohibited from shipping or transporting firearms or ammunition. *Id.* In 1961, Congress "expanded" the statute to cover anyone indicted for a "'crime punishable by imprisonment for a term exceeding one year,'" whether "violent" or not. *Id.* at 93 (quoting Act of Oct. 3, 1961, Pub. L. No. 87–342, § 2, 75 Stat. 757). Section 922(n), therefore, is a creature of the 20th century. The Court in *Bruen*, however, said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S. Ct. at 2154 n.28. A regulation of such recent vintage cannot establish a historical tradition unless they "confirm" earlier practice. *Id.* at 2137.

Here, it does not. Mr. Jackson has been unable to locate any 18th- or 19th-century statutes that, like § 922(n), disarmed felony indictees. In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Churchill concluded, based on that survey, that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. And Mr. Jackson's own examination of historical sources has revealed no statutes disarming felony indictees before the 20th century. *See Laurent*, 861 F. Supp. 2d at 82 (describing indicteee-

disarmament laws as "of comparatively recent vintage").

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(n). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(n) to "confront" the "perceived societal problem" posed by felony indictees' access to guns. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(n) "[i]s unconstitutional." *Id.*

> **3.     The government cannot carry its burden by pointing to statutes that disarmed supposedly "dangerous" or "unvirtuous" groups.**

Based on pleadings in other post-*Bruen* litigation, Mr. Jackson anticipates the government will argue § 922(n) "is consistent with this Nation's historical tradition of firearm regulation," *id.* at 2126, because it is analogous to founding-era laws that disarmed supposedly "dangerous" or "unvirtuous" groups. *E.g.*, *Riddick*, No. 8:22-cr-57-TDC, ECF No. 55 at 7-10. In those other cases, the government points to a handful of colonial and early-republic statutes that made it illegal for slaves and Native Americans to possess firearms, as well as a small number of statutes that conditioned firearm rights on citizens' willingness to swear a loyalty oath to the state. Based on these disparate regulations of discrete groups, the government deduces a broader principle: that the Second Amendment, as it was understood in 1791, did not protect members of *any* group considered "dangerous" or "unvirtuous," even if that specific group was never disarmed at the founding. Therefore, the government contends, statutes like § 922(n)—which disarms "dangerous" and "unvirtuous" felony indictees—are constitutional because they are "relevantly similar" to founding-era laws that prohibited the dangerous and unvirtuous from possessing firearms.

Mr. Jackson will save a full rebuttal of this argument for his reply brief. For now, he simply notes that the premise of the government's argument is flatly at odds with *Bruen*. The

"relevantly similar" test, on which the government's argument relies, applies only when courts engage in "analogical reasoning." *Bruen*, 142 S. Ct. at 2132. And analogical reasoning is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131-32. Since felony indictees' access to firearms has posed a (potential) risk since well before 1791, the government cannot use analogical reasoning and the "relevantly similar" standard to defend § 922(n). It must instead point to a "well-established and representative" tradition of regulations that are "*distinctly* similar" to § 922(n). *Id.* at 2131, 2133 (emphasis added).

Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id.* at 2123-24 & n.2. In a challenge to § 922(n), therefore, a "distinctly similar" historical regulation would be one that either denied or substantially abridged *felony indictees'* access to firearms in particular. By positing a historical tradition of disarming anyone a legislature considers "dangerous" or "unvirtuous," the government argues at too high a level of generality.

Even before *Bruen*, courts indicated the historical inquiry must be more targeted. In *United States v. Chovan*, for example, the Ninth Circuit entertained a Second Amendment challenge to 18 U.S.C. § 922(g)(9), which makes it illegal to possess a firearm following conviction of a "misdemeanor crime of domestic violence." 735 F.3d 1127, 1129-30 (9th Cir.

2013). At the first step of the old means-ends balancing framework—which was an amalgam of *Bruen*'s text-and-history inquiries, *see* 142 S. Ct. at 2127—the government in *Chovan* argued § 922(g)(9) did not burden conduct that "was within the scope of the Second Amendment as historically understood." 735 F.3d at 1137. Specifically, it asserted § 922(g)(9) was "part of a 'long line of prohibitions and restrictions on the right to possess firearms by people perceived as dangerous or violent.'" *Id.* 1137. But the Ninth Circuit rejected the government's framing of the issue, concluding the defendant had satisfied the first step of means-ends balancing because "the government ha[d] not proved that *domestic violence misdemeanants* in particular have historically been restricted from bearing arms." *Id.* (emphasis in original).

Also instructive is the Sixth Circuit's decision in *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016) (en banc). At issue there was a Second Amendment challenge to 18 U.S.C. § 922(g)(4), which prohibits firearm possession by anyone who "has been adjudicated as a mental defective or who has been committed to a mental institution." *Tyler*, 837 F.3d at 681. To show that such people "f[e]ll completely outside the reach of the Second Amendment" as "historically understood," the government pointed to proposals from Pennsylvania's and Massachusetts' constitutional ratifying conventions, which would have prevented the disarmament of "peaceable citizens" or of anyone who did not pose a "real danger of public injury." *Id.* at 688-89. But those proposals, the Sixth Circuit said, failed to establish that mentally ill people, in particular, enjoyed no Second Amendment rights: "While these sources provide a clear basis for *Heller*'s recognition that 'law-abiding, responsible citizens' are at the core of the Second Amendment, they move us no closer to an understanding of which individuals were considered part of that group in 1791." *Id.* at 689. The government

22

argued, as well, that at the founding "the right to bear arms was tied to the concept of a virtuous citizenry." *Id.* "But, again," the Sixth Circuit wrote, "that the Founders understood the Amendment to protect the virtuous does not explain who was counted among that class." *Id.* The lesson is clear: rather than relying on modern-day understandings of broad, vague labels like "dangerous" and "unvirtuous," the government must show that the discrete, narrowly defined class of people governed by a given statute were historically understood to lacks Second Amendment rights.

*Bruen* confirms that in carving out exceptions to "the Second Amendment's unqualified command," 142 S. Ct. at 2126, courts should proceed cautiously, defining those exceptions as narrowly and concretely as possible.

To support its proper-cause requirement, New York relied on a number of English and early American firearms regulations that, in its view, demonstrated a general governmental power to regulate the public carrying of firearms. The Court, however, refused to treat those regulations as more than the sum of their parts. Although New York's cited regulations did suggest the constitutionality of certain narrow, "well-defined" public-carry restrictions, the Court concluded they did not permit "broadly prohibiting" public carry in whatever way a legislature finds appropriate. *Id.* at 2138. New York, in other words, could not derive a general, far-reaching power to proscribe public carry simply by cobbling together a handful of discrete, targeted laws that regulated public carry in limited and specific ways.

First, New York cited the 1328 Statute of Northampton, which "provided that, with some exceptions, Englishmen could not 'come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of

the Justices or other Ministers, nor in no part elsewhere.'" *Id.* at 2139 (quoting 2 Edw. 3 c. 3 (1328)). New York pointed as well to two 17th-century colonial statutes, three states' "late-18th-century and early-19th-century statutes," and several states' "common-law offenses of 'affray,'" all of which prohibited conduct similar to the Statute of Northampton. *Id.* at 2142-46. According to New York, these regulations demonstrated that, notwithstanding the Second Amendment, government enjoys a "sweeping" power to restrict public carry. *Id.* at 2139. But the Court read the regulations more narrowly, as prohibiting only "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at 2145. And because those regulations prohibited only one particular manner of public carry, i.e., bearing arms "to terrorize the people," *id.* at 2143, they did not establish that the Second Amendment "permit[s] *broad* prohibitions on *all* forms of public carry," *id.* at 2145 (emphasis added).

In addition, New York cited several statutes from "the early to mid-19th century" that "proscribed the concealed carry of pistols and other small weapons" in public. *Id.* at 2146. New York argued these statutes demonstrated that states may "ban public carry altogether." *Id.* But again, the Court refused to endorse such a far-reaching reading of the historical record. State courts interpreting those statutes had held "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." *Id.* (emphasis in original). The *Bruen* Court was therefore willing to go that far, but no further—concealed-carry bans are permissible so long as open carry remains available. *See id.* at 2146-47. The Court declined to conclude, based on the permissibility of restricting one "particular mode" of public carry (concealed), that states may enact a "*general* prohibition" on *all* modes of public carry (both concealed and open). *Id.* at 2146-47 & n.19 (emphasis added).

Finally, New York analogized its proper-cause requirement to mid-19th-century "surety

statutes." *Id.* at 2148. Those statutes provided that if someone carried a firearm in public and thereby placed others in reasonable fear of injury, he would have to "post a bond before publicly carrying a firearm" again, unless he could show he had "reasonable cause to fear an assault or other injury." *Id.* The Court in *Bruen* rejected New York's argument that "these 'reasonable-cause laws'" represented a "'direct precursor' to the proper-cause requirement." *Id.* Under surety statutes, "everyone started out with robust carrying rights and only those reasonably accused were required to show a special need in order to avoid posting a bond." *Id.* at 2149. New York's regime, by contrast, "presume[d] that individuals have *no* public carry right without a showing of heightened need." *Id.* at 2148 (emphasis in original). The Court treated surety statutes as a single, narrowly circumscribed limit on carrying in public—not evidence of a general governmental power to regulate public carry in any way whatsoever. Surety statutes did not impose a "severe constraint," like those the government might impose if it enjoyed a general, unparticularized power to regulate public carry. *Id.* at 2149. From the fact that states may "provide financial incentives for responsible" public carry, it does not follow that other, historically unprecedented public-carry restrictions are permissible under the Second Amendment. *See id.* at 2150.

And the Court made clear that, even in the aggregate, these regulations did not add up to a historical tradition of "broadly prohibit[ing]" all forms and manners of public carry. The Court's survey of "Anglo-American history" revealed a small number of "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner by which one carried arms" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied). *Id.* at 2156. But that's all. New York could not extrapolate, from these specifics, a general

25

power to regulate public carry more broadly.

The *Bruen* Court made the same point in its discussion of "sensitive places" where firearms may be "altogether prohibited." *Id.* at 2133. New York argued the sensitive-places doctrine should cover "all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.'" *Id.* But the Court rejected that conception of the term. "Put simply," the Court explained, "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2134. Expanding "sensitive places" in that way "defines the category of 'sensitive places' far too broadly." *Id.* According to the Court, such an understanding of sensitive places "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.* Exceptions to "the Second Amendment's unqualified command," *id.* at 2130, must be defined more narrowly than that.

*Bruen* dooms the government's effort to carve out Second Amendment exceptions for any group labeled "dangerous" or "unvirtuous." As explained above, that effort relies on a handful of founding-era statutes disarming specific groups (slaves, Native Americans, and disloyal subjects), from which the government would glean the much broader principle that "dangerous" or "unvirtuous" groups, in general, do not enjoy the right to keep and bear arms. This is exactly the maneuver the Court rejected in *Bruen*: identify a few specific examples of conduct that historically has been constitutionally unprotected (e.g., carrying firearms "to terrorize the people," carrying concealed in states where open carry is permitted), move up the level-of-generality ladder to a descriptor that unites these discrete examples (e.g., "public

carry"), and then apply that umbrella term to *all* conduct that (arguably) falls in the broader category (e.g., publicly carrying without "proper cause"). *Bruen* makes clear the government cannot abridge fundamental constitutional rights in this way.

In addition, the Second Amendment exceptions that the government's approach would produce are grossly overbroad. The category of "dangerous" persons, for example, is anything but "well-defined." *Bruen*, 142 S. Ct. at 2156. "Dangerous" is an elastic, malleable term that, in the wrong hands, could be applied to virtually any group of people—and one that the government could therefore use to shoehorn historically protected groups into unprotected status. If an open-ended catchall term like "dangerous" could justify disarmament, legislatures would be free to "eviscerate" the right to keep and bear arms. *Bruen*, 142 S. Ct. at 2134. Employing the "dangerous" designation, for instance, a legislature might seek to disarm supporters of an opposing political party, those with a low IQ or intellectual disability, people who get less than five hours' sleep a night, inhabitants of "high-crime" areas, or anyone who's ever been arrested (though not charged) for any criminal offense, no matter how minor. The term "dangerous," in other words, is the kind of "highly manipulable" metric that the Supreme Court has said governments may not use to limit citizens' fundamental constitutional rights. *United States v. Stevens*, 559 U.S. 460, 472 (2010) (interpreting First Amendment, to which *Bruen* analogized Second Amendment by citing *Stevens*).

The "unvirtuous" label is even less "well-defined." *Bruen*, 142 S. Ct. at 2138. That term is so pliant, so capacious, that the government might use the "virtuousness" theory to disarm a seemingly endless number of groups, from serial liars to those who cheat on their spouses to anyone who fails to display "courage," "temperance," "wisdom," or "justice." R. George Wright, *Constitutional Cases and the Four Cardinal Virtues*, 60 Clev. St. L. Rev. 195, 198

(2012). Whether such laws would pass constitutional muster is anyone's guess; "virtue" is about as expansive, ill-defined a basis for limiting constitutional rights as it's possible to imagine. That term not only lacks a "*clear* limiting principle," it lacks any limiting principle at all. *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (declining to carve out a broad, new category of speech unprotected by the First Amendment) (emphasis added).

What's more, applying the "dangerous" and "unvirtuous" labels would require precisely the "judge-empowering interest-balancing inquiry" that *Bruen* forbids. 142 S. Ct. at 2129. If courts are to avoid treating the right to bear arms as "a second-class right," *id.* at 2156, they will have to scrutinize legislatures' judgments: Is it reasonable to conclude that people with low IQ are dangerous, or that adulterers are unvirtuous? How important is it, really, to prevent guns from falling into the hands of someone who was briefly arrested for disorderly conduct but then released without charge? Or someone who is imprudent and uncharitable? Assuming that inhabitants of "high-crime" areas pose *some* minimal danger if allowed to possess guns, could the legislature have written the statutory proscription more narrowly while still achieving the same public-safety benefits?

But this is means-ends balancing all over again—the mode of analysis *Bruen* repudiated. The only way to avoid getting sucked back into that thicket is to conduct the analysis at a lower, more "administrable" level of generality that is tightly tethered to the historical record. *See id.* at 2130. Just as "the very enumeration of the [Second Amendment] right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," *id.* at 2129 (emphasis in original), so too it deprives government of the power to decide who falls into nebulous, manipulable categories like "dangerous" or "unvirtuous." Thus instead of asking whether founding-era laws prohibited

28

firearm possession by "dangerous" or "unvirtuous" people—categories broad enough to sweep in almost anyone—the Court must ask whether such laws, like § 922(n), denied firearms to those whose indictment for a felony suggested they might pose a danger to others if armed. Any other approach risks embroiling courts in "independent means-end scrutiny under the guise" of a historical comparison. *Id.* at 2133 n.7.

The Court should reject the government's (anticipated) argument that § 922(n) is analogous to laws disarming dangerous or unvirtuous citizens.

**B.      Even assuming § 922(n) is facially constitutional, its application to Mr. Jackson violates the Second Amendment.**

If the Court concludes § 922(n) is facially constitutional because it tracks a supposed historical tradition of disarming "dangerous" and "unvirtuous" groups,[2] the Court should nevertheless hold the statute violates the Second Amendment as applied to Mr. Jackson, who is neither dangerous nor unvirtuous.

As discussed above, Mr. Jackson was charged via complaint in the Maricopa County Superior Court of Arizona, on December 8, 2020, for conduct that allegedly took place four days prior, on December 4. That complaint was authored and filed by a deputy county attorney, with no personal knowledge of the evidence alleged against Mr. Jackson. Prior to those allegations, Mr. Jackson had no criminal history. The case was not indicted until late January 2021. Ultimately, the indictment was dismissed in its entirety on May 24, 2022, by motion of the prosecution.[3] By the time of dismissal, Mr. Jackson had spent a year and a half in the community while his charges were pending.

_____

[2] As Mr. Jackson will explain in his reply, no such tradition actually exists.

[3] The same deputy county attorney subsequently charged Mr. Jackson with resisting arrest and hindering prosecution. But those charges—which were made by complaint, not indictment—were not filed until August 30, 2022.

Mr. Jackson was accused, along with a codefendant, of possessing and manufacturing an illegal firearm (a short-barreled rifle). On the day of his arrest by Arizona authorities, Mr. Jackson was observed placing this firearm in the trunk of his car, immediately after the codefendant handed it to Mr. Jackson. Mr. Jackson was not a prohibited possessor of firearms, and the firearm in question objectively appeared to be a handgun; his codefendant and passenger in the car, however, was prohibited from possessing any firearms, based on a prior DUI conviction. Mr. Jackson was accused of passively resisting arrest after police officers conducted a felony stop of his vehicle. The fact of Mr. Jackson's driving this car, and his passive resistance to arrest, formed the basis of the hindering law enforcement charge.

Mr. Jackson was compliant while on pretrial release and, as discussed, was subject to only minimal conditions thereon. After assessing the potential risk Mr. Jackson posed to his community, the Maricopa County Superior Court imposed no restrictions on his right to possess or purchase firearms. The only pretrial issues that arose came when Mr. Jackson was arrested in Maryland for the conduct at issue in this case. Following a hearing by the Maricopa Superior Court, though, Mr. Jackson remained released until the indictment was ultimately dismissed.

When Mr. Jackson was arrested in Hagerstown for the handgun violation at issue in this case, he was polite and cooperative with law enforcement. He did not resist arrest—either passively or actively—when he was taken into custody. Mr. Jackson was speaking—loudly at times, but reasonably and non-threateningly—with other members of a protest when he was pulled aside by law enforcement, after they noticed a suspicious bulge in Mr. Jackson's pants pocket. Mr. Jackson was never reported to have threatened anyone or acted violently in any way. Other than Mr. Jackson's own admissions, no one reported to law enforcement that Mr.

Jackson was armed. And certainly no one reported that Mr. Jackson was misusing a firearm or other weapon. Mr. Jackson was completely unaware that he was prohibited under federal law from carrying his personal firearm while he traveled across state lines.

In short, nothing in Mr. Jackson's background, the circumstances of his Arizona charges, or his performance while on pretrial release suggests he is dangerous or lacking in virtue. Section 922(n) is therefore unconstitutional as applied.

## IV.   Conclusion

Section 922(n) violates the Second Amendment as it was understood at the time of its adoption, both facially and as applied to Mr. Jackson. The Court should therefore dismiss the indictment.

Respectfully submitted,

James Wyda
Federal Public Defender

_____/s/_____
Andrew Szekely
Cynthia Frezzo
Assistant Federal Public Defenders
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
(410) 962-3962
andrew_szekely@fd.org
cynthia_frezzo@fd.org