IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

BRANDON GLEN JACKSON,
*Defendant*.

Criminal No.: ELH-22-141

**MEMORANDUM OPINION**

The dispute at issue has been spawned by the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, ___ U.S. ___, 142 S. Ct. 2111 (2022).  In light of *Bruen*, the Court must determine whether 18 U.S.C. § 922(n) — a statute enacted decades ago — violates the Second Amendment to the Constitution.  The statute makes it illegal for a person under indictment for an offense punishable by imprisonment for a term of one year or more to transport or receive any firearm or ammunition that has travelled in interstate commerce.

A grand jury in the District of Maryland has charged defendant Brandon Glen Jackson with a violation of § 922(n), based on his alleged transportation of a firearm from Arizona to Maryland while he was under indictment in Arizona for a crime punishable by imprisonment for a term exceeding one year.  ECF 17.  Pursuant to *Bruen*, Jackson has filed a "Motion to Dismiss the Indictment Under the Second Amendment."  ECF 34 (the "Motion").  The Motion includes several exhibits.  The government opposes the Motion (ECF 37, the "Opposition"), and Jackson has replied.  ECF 39 (the "Reply").

The Court held a hearing on the Motion on January 20, 2023, at which argument was presented.[1]  Since the hearing, other federal courts have ruled on the constitutionality of various gun regulations in light of *Bruen*.[2]  Accordingly, the parties have supplemented their submissions with recent decisions.  *See* ECF 53 (filed by defendant); ECF 56 (filed by the government). Defendant responded to the government's supplement.  ECF 57.

For the reasons that follow, I shall deny the Motion.[3]

## I. Factual Background

Jackson is a resident of Scottsdale, Arizona.  In December 2020, a police officer in Phoenix charged the defendant and another person by a "Direct Complaint" with several offenses that allegedly occurred on December 4, 2020: conspiracy to commit misconduct involving weapons; resisting arrest; first-degree hindering; and possession of a prohibited weapon, *i.e.*, a rifle with a ten-inch barrel.  *See* ECF 34-1.  The defendant was released on his own recognizance on December 5, 2020, without restrictions.  ECF 34-2 ("Release Order").

On or about January 28, 2021, a grand jury in Maricopa County, Arizona, indicted Jackson on multiple charges, including hindering prosecution in the first degree (a Class 5 felony); the knowing manufacture, possession, transportation, sale, or transfer of a rifle with a 10-inch barrel, which is a prohibited weapon under Arizona law (a Class 4 felony); and resisting arrest.  ECF 34-3 ("Arizona Indictment").  Then, in February or March of 2022, during the pendency of the

---

[1] The defendant appeared from Arizona via Zoom.  *See* ECF 51.  I do not have a transcript of the hearing.  Therefore, to the extent I reference the arguments at the hearing, I rely on my notes.

[2] Indeed, as I was preparing to submit this Memorandum Opinion, I learned of two additional cases decided just days ago, discussed *infra*.

[3] This Memorandum Opinion does not address defendant's motion to suppress evidence. *See* ECF 28.

Arizona Indictment, Jackson traveled to Maryland to participate in a political protest.  He took with him a Smith & Wesson 9mm handgun, serial number JHM2064.

At about 8:00 p.m. on the evening of March 24, 2022, TFC Koontz, a Maryland State Police officer, was dispatched to the Hagerstown Speedway in Hagerstown, Maryland, for a report of a vehicle blocking "the entrance/exit" to the facility where "the Freedom Convoy protest ha[d] been staying . . . ."  *See* ECF 34-4 at 2 ("Statement of Probable Cause").  TFC Koontz saw a "white mini bus" and "a white male standing on top of the bus yelling."  *Id.*  The vehicle was blocking the entrance to the Speedway.  *Id.*  TFC Koontz and TFC Daniels were approached by a white male, later identified as Jackson, who "began voicing his frustrations with certain members of the convoy" at the protest and with security, who were removing certain convoy participants.  *Id.*

According to the Statement of Probable Cause, TFC Koontz asked Jackson if he "could take his bus and sleep elsewhere for the night, until he had the opportunity to speak with the head of the convoy in an attempt to be granted access back into the Hagerstown Speedway."  *Id.* at 2.  Jackson explained that he did not want to leave because "he had belongings" at the Speedway.  *Id.* at 3.  TFC Koontz stated that he then asked Jackson "what belongings he had that he could not retrieve tomorrow."  *Id.*  Jackson responded that he "had guns at his campsite that he couldn't trust other members of his campsite to be left along [sic] with."  *Id.*  TFC Koontz then asked the defendant "if he had any guns on him now."  *Id.*  Jackson responded that he had a 9mm firearm.  *Id.*  Jackson also acknowledged that he did not have a permit to carry the weapon.  *Id.*

TFC Koontz notified his Supervisor, Cpl. Ciccarelli.  Subsequently, Lt. Kloos arrived.  According to TFC Koontz, Lt. Kloos "shined a flashlight at Jackson's waist" and saw an "abnormal bulge" in the area "to his right left front pocket," which was "consistent with the indentation of a concealed weapon."  *Id.*  Lt. Kloos then searched Jackson and recovered "a loaded" 9mm handgun

from a leather holster against the defendant's right thigh.  ECF 34-4 at 3.  Jackson was searched and arrested.  *Id.*

A criminal complaint was filed against Jackson in federal court in Maryland on March 30, 2022, alleging his violation of 18 U.S.C. § 922(n).  ECF 1.  It was supported by the Affidavit of Jessica Woodin, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.  ECF 1-1.  The Indictment followed on April 14, 2022.  ECF 17.

In the Motion, Jackson claims that the conduct at issue is protected by the Second Amendment, and that § 922(n) is unconstitutional, both facially and as applied.  ECF 34.  As indicated, defendant bases his Second Amendment challenge on the Supreme Court's opinion in *Bruen*, which was issued in June 2022.  As the defense puts it, *Bruen* "upended Second Amendment law."  *Id*. at 1.  The government maintains that, notwithstanding *Bruen*, § 922(n) does not violate the Second Amendment.  It urges the Court to deny the Motion.  ECF 37.

Additional facts are included, *infra*.

## II. Discussion

### A.

A motion to dismiss an indictment is governed by Rule 12 of the Federal Rules of Criminal Procedure, which states: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b).  Under Rule 12, the Court should dismiss criminal charges in an indictment "where there is an infirmity of law in the prosecution", such as an unconstitutional statute.  *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).

As noted, defendant presents both a facial and an as-applied challenge to 18 U.S.C. § 922(n).  *See* ECF 34 at 29.  A facial challenge presents a "claim that the statute is unconstitutional

*not* as it applies to [the defendant's] own conduct, but rather 'on its face,' as it applies to the population generally." *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020), *cert. denied*, ___ U.S. ___, 141 S. Ct. 2756 (2021) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)) (emphasis in *Miselis*). Ordinarily, a facial challenge requires a showing that "no set of circumstances exists under which the [statute or regulation] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also United States v. Stevens*, 559 U.S. 460, 472 (2010); *Wash. State Grange*, 552 U.S. at 449; *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (en banc). This is a "heavy burden" to meet, *Salerno*, 481 U.S. at 745, and such claims are "'disfavored.'" *Miselis*, 972 F.3d at 530 (citation omitted).

In contrast, an as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]" *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc). "It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (internal quotation marks omitted).

## B.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In the seminal case of *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court determined that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." The "central" aspect of this right is the "right of self-defense." *Id.* at 628. The Court noted, however, that, as with other fundamental

rights, "the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court indicated that its decisions in this context apply to "law-abiding, responsible citizens," and said: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* According to the Court, such restrictions are "presumptively lawful regulatory measures," and the list is not exhaustive. *Id.* at 627 n.26.

Two years after *Heller*, in *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 778 (2010), the Supreme Court reiterated that the Second Amendment is a fundamental right, applicable to the states pursuant to the Due Process Clause of the Fourteenth Amendment. But, the Court again made clear that the Second Amendment permits "reasonable firearms regulations." *Id.* at 785.

In the decade following *Heller* and *McDonald*, the federal appellate courts uniformly utilized a "two-step" approach to assess the constitutionality of firearms regulations, applying strict or intermediate scrutiny and conducting a means-ends analysis to determine whether the state's interest in a regulation was sufficient to overcome whatever burden the law placed on an individual's Second Amendment right. *See Bruen*, 142 S. Ct. at 2125.[4] Notably, under this

---

[4] As the *Bruen* Court explained, "[a]t the first step, the government may justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood.'" *Bruen*, 142 S. Ct. at 2126 (alteration in *Bruen*). If the government can prove that the regulated conduct falls beyond the scope of the Second Amendment, based on its "historical meaning," then the activity is not protected by the Amendment and "'the analysis can stop there' . . . ." *Id.* (citation omitted). But, if the historical evidence is "'inconclusive or suggests that the regulated activity is *not* categorically unprotected,' the courts generally proceed to step two." *Id.* (citation omitted; emphasis in *Bruen*). "At the second step, courts often analyze 'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right.'" *Id.* (citation omitted). If a core Second Amendment right is burdened, "courts apply 'strict scrutiny' and ask whether the Government can prove that the law is 'narrowly tailored to achieve a compelling governmental interest.'" *Id.* (citation omitted). Otherwise, courts apply intermediate scrutiny and "consider whether the

approach, § 922(n) has never been held unconstitutional.  *See, e.g., United States v. Love*, VAR-20-20327, 2021 WL 5758940, at *2 (E.D. Mich. Dec. 3, 2021); *United States v. Call*, 874 F. Supp. 2d 969, 978-79 (D. Nev. 2012); *United States v. Laurent*, 861 F. Supp. 2d 71, 105 (E.D.N.Y. 2011). In *Bruen*, however, the Supreme Court concluded that this two-step approach was "one step too many."  142 S. Ct. at 2127.

In *Bruen*, the Court analyzed the constitutionality of a New York firearm licensing scheme that dated to 1911, concerning the public carrying of a concealed firearm.  Under that law, in order to obtain a permit to carry a concealed handgun in public, an applicant was required to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community."  *Id*. at 2123.  The Court concluded that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment.  *Id.* at 2156.  In making that ruling, the Court put in place a new test to govern Second Amendment challenges.

The Court rejected the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," around which the Courts of Appeals had, prior to *Bruen*, "coalesced."  *Id*. at 2125.  The Court said, *id.* at 2126 (citation omitted).

> [W]e decline to adopt that two-part approach.  In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively, protects that conduct.  To justify its regulations, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[5]

---

Government can show that the regulation is 'substantially related to the achievement of an important governmental interest.'"  *Id*. (citation omitted).

[5] Underscoring the significance of its pronouncement, the Supreme Court reiterated almost the identical statement a few pages later, *Bruen*, 142 S. Ct. at 2129-30 (citation omitted):

This test "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. To make this assessment, a court must engage in a two-pronged analysis.

A court must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does not, the analysis ends, and the government's regulation is valid. However, if the conduct at issue is covered by the Amendment's text, the conduct is presumed protected, and the government must then demonstrate that the regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2130. Only if a firearm regulation is consistent with this Nation's historical traditional may a court conclude that the individual's conduct falls outside the protection of the Second Amendment. *Id.*

Accordingly, in applying *Bruen*'s framework to this case, I must consider whether the Second Amendment's plain text covers Jackson's conduct. If so, I must determine whether, either facially or as applied to defendant, 18 U.S.C. § 922(n) is consistent with the Nation's historical tradition of firearm regulation.

## C.

As indicated, *Bruen* requires that, before a court embarks on an analysis of our Nation's history, it must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. Jackson is charged with transporting a firearm across state

---

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

lines while under felony indictment.  ECF 17.  Therefore, the first step under *Bruen* is to determine whether this conduct falls under the Second Amendment, which protects "the right of the people to keep and bear Arms."  U.S. Const. amend. II.

"[T]he Second Amendment, like the First and Fourth Amendments, codified a preexisting right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence."  *Heller*, 554 U.S. at 592; *see also id*. at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).  Accordingly, the Second Amendment is "enshrined with the scope [it was] understood to have when the people adopted [it]."  *Heller*, 554 U.S. at 634-35.

The government argues that the Second Amendment's plain text does not cover Jackson's conduct, because it does not extend to transportation of firearms in interstate commerce by a person under indictment for a felony offense.  ECF 37 at 5.  However, in *Heller*, 554 U.S. at 582, the Supreme Court defined "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession."  (Cleaned up) (citing founding-era dictionaries).  According to the defendant, the Second Amendment's text does not suggest that "possession of a firearm is unprotected simply because a defendant is in a car or crosses state lines."  ECF 39 at 5.  Therefore, defendant maintains that transporting a firearm qualifies as "keep[ing]" arms under the Second Amendment's plain text.  ECF 34 at 11.  And, it is his position that he is "among 'the people' protected by the Second Amendment."  *Id*. at 17.  The government does not vigorously contest this claim.  *See* ECF 37.

Notably, *Heller* did not exhaustively analyze "the full scope of the Second Amendment." 554 U.S. at 626.  But, the Court explained that the Second Amendment is "not unlimited."  *Id.*

9

And, the Court identified a non-exhaustive list of "presumptively lawful regulatory measures," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id*. at 626-27 & n.26; *see also McDonald*, 561 U.S. at 786 (repeating *Heller*'s "assurances" about restrictions on felons and the mentally ill). The Second Amendment's scope excludes those people because it codified a "right of law-abiding, responsible citizens." *See Heller*, 554 U.S. at 635.

Echoing *Heller*, the Supreme Court in *Bruen* explicitly and repeatedly described the right as one belonging to law-abiding citizens. *See, e.g.,* 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id*. at 2131 (quoting *Heller*'s statement that the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense"); *id*. at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id*. at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"). Thus, the focus of *Bruen* was on "regulations impacting law-abiding citizens, as opposed to the class of regulations prohibiting certain people from carrying firearms based on their conduct or characteristics." *United States v. Nutter*, ___ F. Supp. 3d ___, 2022 WL 3718518, at *4 (S.D.W.V. Aug. 29, 2022) (noting that such regulations "have a longstanding history"), *appeal docketed*, No. 22-3451 (4th Cir. Sept. 22, 2022).

Indeed, in *Bruen*, 142 S. Ct. at 2134, the Court observed that the parties did not dispute "that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the

people' whom the Second Amendment protects."  Thus, the Court seemed to imply that the Second Amendment covered them because they were undisputedly law-abiding, responsible citizens.

Furthermore, *Bruen* explained that its opinion should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 142 S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635); *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").  Those regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens."  *Id*. at 2138 n.9 (quotation marks omitted).  And, many states' standards disqualify indicted defendants or anyone prohibited by federal law from having a gun.[6]

To be sure, the Supreme Court has not precisely defined the community of law-abiding, responsible citizens who enjoy the right to bear arms.  However, it has given no indication that a felony conviction is necessary to establish that a person is non-law-abiding.  To the contrary, as noted, the Court has explained that laws disarming "felons and the mentally ill" were part of a *non-*

---

[6] *See, e.g.*, Ariz. Rev. Stat. § 13-3112(E)(3) (requiring that the applicant "[i]s not under indictment for and has not been convicted in any jurisdiction of a felony . . . and [that] the applicant is currently not a prohibited possessor under state or federal law"); Ky. Rev. Stat. § 237.110(4)(a) (requiring that the applicant "[i]s not prohibited from the purchase, receipt, or possession of firearms, ammunition, or both pursuant to 18 U.S.C. 922(g), 18 U.S.C. 922(n), or applicable federal or state law"); La. Stat. § 40:1379.3(C)(10) (requiring that the applicant "not be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"); Tenn. Code § 39-17-1351(c)(7) (requiring that "the applicant is not currently under indictment or information for any criminal offense that is designated as a felony, or that is [a] disqualifying misdemeanor[]").

*exhaustive* list of "presumptively lawful" restrictions.  *Heller*, 554 U.S. at 626-27 & n.26 (emphasis added).

The Fourth Circuit, too, has interpreted the Second Amendment as covering only law-abiding citizens.  In *United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012), the Court said that "the scope of the Second Amendment does not extend to provide protection to illegal aliens, because illegal aliens are not law-abiding members of the political community."  And, in oral argument, defendant conceded that illegal aliens would not be covered by the Second Amendment.  *See* ECF 54.

In *Bruen's* wake, in the case of *United States v. Ingram*, ___ F. Supp. 3d ___, 2022 WL 3691350 (D.S.C. Aug. 25, 2022), a judge in the District of South Carolina considered a challenge to 18 U.S.C. § 922(g) and § 924(c).[7]  Section 922(g) makes it unlawful for a felon to possess a firearm, and § 924(c) makes it unlawful to use or carry a firearm in furtherance of a drug trafficking crime or a crime of violence.  *Id.* at *1.  The defendant challenged his indictment under each statute, arguing that the conduct prohibited by those statutes is "protected by the plain text of the Second Amendment and historically unregulated."  *Id.*  Rejecting this argument, the court determined that the distinction between law-abiding and non-law-abiding citizens in *Heller*, *McDonald*, and *Bruen* "clarifies the bounds of the plain text of the Second Amendment."  *Id.* at *3.  The court reasoned that because the statutes at issue "prohibit the use of firearms by non-law-abiding citizens for unlawful purposes," the conduct they prohibit is not protected by the Second Amendment.  *Id.*

Similarly, in *Nutter*, 2022 WL 3718518, at *1, a judge in the Southern District of West Virginia rejected a post-*Bruen* challenge to the constitutionality of 18 U.S.C. §§ 922(g)(9) and

---

[7] To my knowledge, this case is not on appeal to the Fourth Circuit.

924(a)(2).[8]  Sections 922(g)(9) and 924(a)(2) make it unlawful for a person previously convicted of a misdemeanor crime of domestic violence to possess or transport a firearm.  *Id*.  The court underscored the importance of "the Supreme Court's repeated invocation of 'law-abiding citizens' in its recent Second Amendment jurisprudence," and found support in the historical tradition for laws prohibiting certain categories of persons from possessing firearms in the interest of public safety.  *Id*. at *7–8.  Moreover, the court observed that these historical categories were not limited to felons, but extended more broadly to "groups identified as dangerous," "classes of individuals reasonably regarded as posing an elevated risk for firearms violence," and "any person viewed as potentially dangerous."  *Id*. at *7 (citations omitted).

Several other district courts have likewise rejected post-*Bruen* challenges to status-based gun laws on the ground that the restricted people are not law-abiding, responsible citizens to whom the Second Amendment applies.  *See, e.g.*, *United States v. Grinage*, JKP-21-399, 2022 WL 17420390, at *5 (W.D. Tex. Dec. 5, 2022) (explaining that *Heller* and *Bruen* "lead[] the Court to conclude convicted felons like Grinage are not included in 'the people' protected by the Second Amendment"); *United States v. Young*, ___ F. Supp. 3d ___, 2022 WL 16829260, at *7 (W.D. Pa. Nov. 7, 2022) ("*Bruen*, *Heller* and *McDonald* dictate that Defendant's alleged conduct does not fall within the scope of the Second Amendment's protections due to his felony drug convictions."); *United States v. Grant*, MGL-22-161, 2022 WL 16541138, at *3 (D.S.C. Oct. 28, 2022) ("By distinguishing non-law-abiding citizens from law-abiding ones, the dicta in *Heller* and *McDonald* clarifies the bounds of the plain text of the Second Amendment.").

---

[8]  Section 924(a)(2) was amended and no longer provides the penalty for § 922(g) convictions; the new penalty provision in 18 U.S.C. § 924(a)(8) sets forth a statutory maximum sentence of 15 years' imprisonment for a § 922(g) offense.  *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 12004(c), 136 Stat. 1313, 1329 (2022).

An indictment is a charging instrument issued by a grand jury.  However, a grand jury cannot return an indictment unless a majority of the grand jurors find probable cause to believe that the defendant committed the crime at issue.  *See United States v. Conley*, 186 F.3d 7, 15 n.4 (1st Cir. 1999) ("The standard of proof governing the grand jury decision to indict is probable cause.")  And, probable cause that a person committed a serious crime is sufficient to trigger a range of liberty restrictions, including pretrial detention.  *See, e.g.*, 18 U.S.C. § 3142; *United States v. Thomas*, 540 F. Supp. 3d 363, 370 (W.D.N.Y. 2021) ("[T]he reality is that once an individual has been charged with a crime, certain rights must give way to reasonable restrictions in order to protect the safety of others and the community, prevent any risk of flight, and ensure compliance with pretrial release conditions.").

Notably, in the context of gun restrictions with regard to pretrial release conditions, at least two courts have concluded that an indicted defendant "[b]y definition . . . falls outside the scope of [the Second Amendment's] protections" because he was charged with a crime "based on a finding of probable cause."  *United States v. Fencl*, JLS-21-3101, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022) (concerning unlawful possession of firearms); *see also United States v. Perez-Garcia*, ___ F. Supp. 3d ___, 2022 WL 4351967, at *6 (S.D. Cal. Sept. 18, 2022) ("As a person who has been charged with a crime based on a finding of probable cause, [defendant] would not be considered a 'law-abiding' or responsible citizen, so he is outside the plain text of the Second Amendment.").

Pointing to the presumption of innocence, Jackson argues, *inter alia*, that he is protected by the plain text of the Second Amendment.  ECF 34 at 15-17.  But, the court in *Fencl*, as well as the court in *Perez-Garcia*, specifically rejected each defendant's reliance on the presumption of innocence.  In *Fencl*, the court cited *Perez-Garcia* for the proposition that the Second Amendment

"does not deprive the Government of the ability to place significant, but temporary, restrictions on an accused's constitutional rights in order to further its interest in community safety." 2022 WL 17486363, at *2. In turn, in *Perez-Garcia,* 2022 WL 4351967, at *6, the court collected cases supporting the proposition that "[p]ersons with criminal charges pending are routinely subject to significant restrictions on their constitutional rights once probable cause has been shown." *See also Salerno*, 481 U.S. at 748 ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest.").

Clearly, as to one who has been indicted, the "presumption of innocence" is not an impediment to various impositions on constitutional liberties. For instance, in *Kaley v. United States*, 571 U.S. 320, 329 (2014), the Supreme Court stated that an "inviolable grand jury finding . . . may do more than commence a criminal proceeding (with all the economic, reputational, and personal harms that entails); the determination may also serve the purpose of immediately depriving the accused of her freedom" and "eliminate[] her Fourth Amendment right to a prompt judicial assessment of probable cause to support any detention." *Id*. (citing *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975)). Further, the *Kaley* Court concluded, 571 U.S. at 330, that the government can freeze an indicted defendant's forfeitable assets without violating the Fifth Amendment due process right or the Sixth Amendment right to counsel, stating that if the grand jury's probable cause finding is "reliable enough, protective enough" to "restrain persons," then it must be sufficient to restrain property.

Similarly, the Supreme Court has upheld restraints on pretrial detainees' First Amendment liberties. *See Bell v. Wolfish*, 441 U.S. 520, 550 (1979). After rejecting Fourth and Fifth Amendment challenges by pretrial detainees to their conditions of confinement, *see id*. at 541, 544, the *Bell* Court considered whether the First Amendment allowed prison officials to prohibit them

from receiving books and magazines, other than from the publisher or a book club.  *See id*. at 549-51.  The Court found that the prohibition did not violate the First Amendment, as it was a rational response to security concerns.  *Id*. at 550.

And, of particular import, the Court in *Bell* explained that the "presumption" of innocence is a trial right: "'an inaccurate, shorthand description'" of the government's burden to prove guilt beyond a reasonable doubt.  *Id*. at 533 (quoting *Taylor v. Kentucky*, 436 U.S. 478, 484 n.12 (1978)); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) (explaining that the presumption of innocence protects "the fairness of the fact-finding process" and "guard[s] against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt").  However, the presumption of innocence "has no application" with regard to an indicted defendant's liberties "before his trial has even begun."  *Bell*, 441 U.S. at 533.

Thus, on a continuum, with a law-abiding citizen at one end and a convicted citizen at the other, a citizen under indictment is by no means akin to the status of a law-abiding individual, such that the plain text of the Second Amendment applies to an individual under indictment.

Nevertheless, to my knowledge, of the few district courts that have specifically addressed the constitutionality of § 922(n) post-*Bruen*, they have all concluded that the plain text of the Second Amendment covers the conduct of individuals under indictment.  *See United States v. Kays,* ___ F. Supp. 3d ___, 2022 WL 2728519, at *2 (W.D. Okla. Aug. 29, 2022) (concluding that a defendant charged under § 922(n) is covered by the plain text of the Second Amendment, but nonetheless finding that the statute does not violate the Second Amendment); *see also, e.g., United States v. Bartucci*, EPG-19-244, 2023 WL 2189530, at *6 (E.D. Cal. Feb. 23, 2023); *United States v. Gore*, SDM-23-4, 2023 WL 2141032, at *3 (S.D. Ohio Feb. 21, 2023); *United States v. Rowson,* PAE-22-310, 2023 WL 431037, at *19 (S.D.N.Y. Jan. 26, 2023); *United States v. Hicks*, ___ F.

Supp. 3d ___, 2023 WL 164170, at *4 (W.D. Tex. Jan. 9, 2023); *United States v. Stambaugh*, ___
F. Supp. 3d ___, 2022 WL 16936043, at *2 (W.D. Okla. Nov. 14, 2022); *United States v. Holden*,
___ F. Supp. 3d ___, 2022 WL 17103509, at *3 (N.D. Ind. Oct. 31, 2022); *United States v. Quiroz*,
___ F. Supp. 3d ___, 2022 WL 4352482, at *3 (W.D. Tex. Sep. 19, 2022); *United States v. Kelly*,
AAT-22-37, 2022 WL 17336578, at *3 (M.D. Tenn. Nov. 4, 2022); *United States v. Reaves*, HEA-
22-224, ECF 55 (E.D. Mo. Jan 9, 2023).

Accordingly, I shall assume, *arguendo*, that Jackson is among "the people" to whom the
Second Amendment applies, despite his status as an indictee.  If so, § 922(n) is presumptively
unconstitutional.  Therefore, I turn to the question of whether the government has justified the
regulation by "demonstrating that it is consistent with the Nation's historical tradition of firearm
regulation." *Bruen*, 142 S. Ct. at 2129–30.

### D.

In *Bruen*, 142 S. Ct. at 2130, the Court observed that the "focus on history . . . comports
with how [courts] assess many . . . constitutional claims."  It is common for the Court to "'loo[k]
to history for guidance.'"  *Id*.  Nevertheless, the Supreme Court acknowledged that "'[h]istorical
analysis can be difficult'" and may require "'nuanced judgments'. . . ."  *Id*. (quoting *McDonald*,
561 U.S. at 804 (Scalia, J., concurring) (alteration in *Bruen*).  Moreover, it could not foresee every
potential question that might arise under the *Bruen* approach.  142 S. Ct. at 2132.

However, the Court provided some tools for assessing whether a particular modern law
comports with historical tradition.  For instance, "when a challenged regulation addresses a general
societal problem that has persisted since the 18th century, the lack of a distinctively similar
historical regulation addressing that problem is relevant evidence that the challenged regulation is
inconsistent with the Second Amendment."  *Id.* at 2131.  In the same vein, "if earlier generations

addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* Furthermore, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence" of unconstitutionality. *Id.*

On the other hand, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approached." *Id.* at 2132. The Supreme Court noted that the "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Yet, the Court noted that "the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adopted to the various crises of human affairs.'" *Id.* (quoting *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819) (emphasis deleted)). Indeed, the Court noted that although the "meaning" of the Constitution "is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen,* 142 S. Ct. at 2132; *see also id.* (reiterating that the Second Amendment's "historically fixed meaning applies to new circumstances . . . .").

On this basis, the Court recognized that the reference to "arms" in the Second Amendment "does not apply 'only [to] those arms in existence in the 18th century.'" *Id.* (quoting *Heller*, 554 U.S. at 582). And, as the Supreme Court itself acknowledged, "applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins." *Bruen*, 142 S. Ct. at 2134. [9]

---

[9] If the meaning of the Second Amendment is "fixed" in time, as *Bruen* said, 142 S. Ct. at 2132, it is not clear why it extends to weapons that were never envisioned when it was enacted. It seems that the meaning of the Second Amendment is fixed in some ways, but not others. Indeed,

Therefore, "[w]hen confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy[.]" *Id.* at 2132.  And, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that regulatory burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *Heller*, 554 U.S. at 599, and *McDonald*, 561 U.S. at 767 (emphasis in all three cases).  Notably, the Supreme Court made clear that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen,* 142 S. Ct. at 2133 (emphasis in original).

I pause to note the challenges created by *Bruen's* assignment.

"Courts are, after all, staffed by lawyers, not historians" and "[l]egal experts typically have little experience answering contested historical questions or applying those answers to resolve contemporary problems." *Bruen,* 142 S. Ct. at 2177 (Breyer, J., dissenting).  As Justice Breyer put it in his dissent, there are inherent difficulties spawned by relying "nearly exclusively on history to interpret the Second Amendment." *Id.*  He asked, *id.*:

> Do lower courts have the research resources necessary to conduct exhaustive historical analyses in every Second Amendment case?  What historical regulations and decisions qualify as representative analogues to modern laws?  How will judges determine which historians have the better view of close historical questions?  Will the meaning of the Second Amendment change if or when new historical evidence becomes available?  And, most importantly, will the Court's approach permit judges to reach the outcomes they prefer and then cloak those outcomes in the language of history?

Further, Justice Breyer observed that "the difficulties attendant to extensive historical analysis [are] especially acute in the lower courts." *Id.* at 2179.  For example, in the *Bruen* decision

---

the Court in *Bruen* indicated that the Second Amendment "must apply to circumstances beyond those the Founders specifically anticipated." *Id*.

itself, "[t]he Court's historical analysis . . . is over 30 pages long and reviews numerous original sources from over 600 years of English and American history." *Id.* But, "[l]ower courts—especially district courts—typically have fewer research resources, less assistance from *amici* historians, and higher caseloads," as well as fewer law clerks, making them "ill equipped to conduct the type of searching historical surveys that the Court's approach requires." *Id.*

Moreover, Justice Breyer pointed out that "the Court's opinion . . . gives the lower courts precious little guidance regarding how to resolve modern constitutional questions based almost solely on history." *Id.* at 2179.  For instance, Justice Breyer observed, *id.*:

> Other than noting that its history-only analysis is "neither a . . . straightjacket nor a . . . blank check," the Court offers little explanation of how stringently its test should be applied.  *Ante,* at 2133.  Ironically, the only two "relevan[t]" metrics that the Court does identify are "how and why" a gun control regulation "burden[s the] right to armed self-defense."  *Ante,* at 2133.  In other words, the Court believes that the most relevant metrics of comparison are a regulation's means (how) and ends (why)—even as it rejects the utility of means-end scrutiny.

Recently, Judge Stephen Higginson of the Fifth Circuit echoed these concerns after hearing arguments on the constitutionality of 18 U.S.C. § 922(n).  *See* Avalon Zoppo, *Judge Frustrated Over Lack of Historical Analysis in Gun Rights Case*, NATIONAL LAW JOURNAL (Feb. 8, 2023), https://www.law.com/nationallawjournal/2023/02/08/judge-frustrated-over-lack-of-historical-analysis-in-gun-rights-case/?slreturn=20230109162255.   During an exchange with the government's lawyer, Judge Higginson asked: "What's the authority that we can decide history? The Supreme Court in *Bruen* had 80 amici from Ph.D. historians.  We have one amicus." *Id.*  He continued: "I'm not blaming you because I'm not a Ph.D. either.  But you each gave us I think four law review articles not from historians. . . . And we have 20 minutes to ask you questions and [the lower court judge] didn't have a chance to ask a single question." *Id.*

Undoubtedly, there are historical facts that are unassailable.  For example, everyone would agree that the Declaration of Independence was signed on July 4, 1776.  But, historians continue to explore, discover, interpret, and *disagree* about more complex historical matters, including the Founders' intent.  "[T]he extent to which colonial statutes enacted over 200 years ago were actually enforced, the basis for an acquittal in a 17th-century decision, and the interpretation of English laws from the Middle Ages (to name just a few examples) are often less than clear," and "even historical experts . . . reach conflicting conclusions based on the same sources."  *Bruen*, 142 S. Ct. at 2180 (Breyer, J., dissenting).  Furthermore, "as technological progress pushes our society ever further beyond the bounds of the Framers' imaginations, attempts at 'analogical reasoning' will become increasingly tortured."  *Id.* at 2181.

As noted, judges are not historians.  In confronting a Second Amendment challenge to the federal law barring firearm possession for individuals with felony convictions, the court in *United States v. Bullock*, CWR-18-165, 2022 WL 16649175, at *3 (S.D. Miss. Oct. 27, 2022), underscored the problems that ensue when judges must analyze conflicting historical interpretations, and it suggested that "[a]n expert may help the Court identify and sift through authoritative sources on founding-era firearms restrictions."  Consequently, that court asked the parties for supplemental briefing on "whether it should appoint a historian to serve as a consulting expert in this matter." *Id.*; *see* Fed. R. Evid. 706(a) ("On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations. The court may appoint any expert that the parties agree on and any of its own choosing.").

Other courts have followed suit.  *See Baird v. Bonta*, ___ F. Supp. 3d ___, 2022 WL 17542432, at *9 (E.D. Cal. Dec. 8, 2022) ("On the court's own motion, to facilitate the court's

considerations of any obligations it has following *Bruen*, the parties are ordered to show cause within thirty days why the court should not appoint its own expert witness to collect and survey evidence of the 'historical tradition that delimits the outer bounds of the right to keep and bear arms,' *Bruen*, 142 S. Ct. at 2127, as relevant to this case, *see* Fed. R. Evid. 706(a).") (emphasis omitted).  On the other hand, some judges have noted that, "as helpful as that approach might be, this court doubts that it can be scaled to the level that would be required by the federal courts' massive docket of gun prosecutions."  *Kelly*, 2022 WL 17336578, at *3 n.5.

Moreover, and as discussed, *infra*, the conflicting lower court decisions that have applied *Bruen*'s test to § 922(n), only to reach divergent conclusions, give reason to suggest that a history-only test is not readily administrable.  Plainly put, the fractured rulings reflect that there is no one conclusive interpretation of the Nation's historical tradition with regard to firearm regulation.  In this vein, at least one judge has pointed out that the traditions from which *Bruen* requires judges to draw were formed nearly exclusively by white men in an era when women and minorities did not have a voice.  *See, e.g.*, *State v. Philpotts*, 194 N.E.3d 371, 373 (Ohio 2022) (Donnelly, J. dissenting) ("[T]he glaring flaw in any analysis of the United States' historical tradition of firearm regulation in relation to Ohio's gun laws is that no such analysis could account for what the United States' historical tradition of firearm regulation would have been if women and nonwhite people had been able to vote for the 'representatives who determined these regulations.").

To be sure, "*Bruen* is a new case, and some of the uncertainty that its test has engendered will presumably recede over time, as the appellate courts sort the permissible gun regulations from the impermissible, based on whatever methods of analogy and glimpses of history find their way into the appellate record."  *Kelly,* 2022 WL 17336578, at *4.  In the meantime, as one court colorfully put it, the critical question the lower courts face is "whether *Bruen* requires the

regulatory landscape be trimmed with a scalpel or a chainsaw." *United States v. Perez-Gallan*, ___ F. Supp. 3d ___, 2022  WL 16858516, at *1 (W.D. Tex. Nov. 10, 2022).  And, whether or not the courts are "actually well-suited" for *Bruen*'s task,  *Kelly*, 2022 WL 17336578, at *3, *Bruen*'s command must be followed.  Therefore, I turn to the Motion.

**E.**

Defendant attempts to clarify the standard articulated in *Bruen*, arguing: "Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically 'unprecedented' challenges."  ECF 34 at 7.  However, *Bruen*'s history inquiry does not split neatly into (1) a "straightforward" approach for statutes "address[ing] a general societal problem that has persisted since the 18th century," which always requires a "distinctly similar" historical regulation; and (2) "a more nuanced approach" for laws addressing "unprecedented societal concerns," which calls for analogical reasoning.  *See Bruen*, 142 S. Ct. at 2131-32.  In fact, *Bruen* itself considered a law addressing the persistent problem of "handgun violence, primarily in urban areas," *id*. at 2132 (citation omitted), but still scoured centuries of English and American history for relevant analogues when it applied the test to New York's law. *See id*. at 2135-56.  And, the Court did not rule that "the lack of a distinctly similar historical regulation" is dispositive for laws addressing a persistent problem; rather, only that it "is relevant evidence."  *Id*. at 2131.  Otherwise, some restrictions that the Founders would have "believed to be permissible" would fail just because they "happened [not] to exist in the founding era."  *See Kelly*, 2022 WL 17336578, at *2.

To be sure, *Bruen*'s guidance forecloses simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application."  *Id*.  That is "because a list of the laws that happened to exist in the founding era is,

as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution." *Id.*  Thus, a court conducting *Bruen*'s historical inquiry must not only "consider what earlier legislatures did, but imagine what they could have imagined." *Id*.

Furthermore, a particular challenge in determining whether a societal problem is "unprecedented" is that the firearms available today are not the same as the firearms available at the time of the founding. *Bruen*, 142 S. Ct. at 2132.  In *Quiroz*, the judge in the Western District of Texas observed, 2022 WL 4352482, at *8:

> [I]f one lived more than a day's journey from civilization, a firearm was not only vital for self-defense—it put food on the table.  Indeed, whether fending off wild animals or hunting, a firearm was a necessary survival tool.  That is why disarming someone was likely unthinkable at the time—no firearm in the wilderness meant almost certain death.

"Society, population density, and modern technologies are all examples of change that would make something [that was] unthinkable in 1791" a societal concern today. *Id*.  And, it is not always clear which problem, or set of problems, led modern legislatures to enact a law that past legislators did not.

At least one district court has noted that "the public safety threat posed by pretrial indictees was not, in the main, 'a general societal problem' at the founding." *Rowson*, 2023 WL 431037, at *24 (quoting *Bruen*, 142 S. Ct. at 2131).  Regardless, courts since *Bruen* have stated that analogical reasoning takes place no matter the nature of the social problem. *Firearms Pol'y Coal., Inc. v. McCraw*, ___ F. Supp. 3d ___, 2022 WL 3656996, at *8 (N.D. Tex. Aug. 25, 2022) ("Courts use analogical reasoning to determine whether a modern regulation is constitutional.")  And, to my knowledge, all of the district court decisions pertaining to § 922(n) have considered historical analogies. *See*, *e.g.*, *Rowson*, 2023 WL 431037, at *21; *Hicks*, 2023 WL 164170, at *3;

24

*Stambaugh*, 2022 WL 16936043, at *3; *Holden*, 2022 WL 17103509, at *4; *Quiroz*, 2022 WL 4352482, at *4; *Kays*, 2022 WL 2728519, at *3; *Kelly*, 2022 WL 17336578, at *2.  Accordingly, the government has proffered what it regards as historical analogues to show that the statute is consistent with the country's historical tradition of firearm regulation under the *Bruen* standard.

The government argues that the United States "has always categorically restricted the gun rights of certain groups to promote public safety."  ECF 37 at 8.  In support of that position, the government notes that, at the time of the Colonies, "'gun safety regulation was commonplace'", and "'several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation.'"  *Id*. (quoting *National Rifle Association of America, Inc., et al. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, et al.*, 700 F.3d 185, 200 (5th Cir. 2012), abrogated on other grounds by *Bruen*, 142 S. Ct. at 2127 n.4).  In *Range v. Attorney General [of the] United States*, 53 F.4th 262, 278-79 (3d Cir. 2022) (per curiam), vacated pending en banc hearing, 56 F.4th 992 (2023), the Third Circuit described several such laws, including a 1774 Connecticut law as well as laws passed by Pennsylvania and Virginia in 1777; *see also Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States").[10]

Additionally, the government points out that many courts have concluded, based on the historical evidence and analyses presented to them, that the common law tradition of gun regulation "permits restrictions directed at citizens who are not law-abiding and responsible." *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *see also United States v. Yancey*, 621

---

[10] I draw upon the *Range* panel's collection of historical analogues, but because the decision has since been vacated in favor of en banc review, I do not accord it precedential weight.

F.3d 681, 685–86 (7th Cir. 2010) ("Most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010)).

In *Bena*, 664 F.3d at 1183, the Eighth Circuit relied on *Heller*'s description of the right to bear arms as protecting law-abiding citizens.  And, it observed that the Supreme Court "viewed the regulatory measures it listed"—such as restrictions on the rights of felons and the mentally ill—"as presumptively lawful because they do not infringe the Second Amendment right."  *Id*. Thus, the court held that § 922(g)(8), which prohibits possession of a firearm by individuals subject to a Domestic Abuse Court Order, "is consistent with a commonlaw tradition that the right to bear arms is limited to peaceable or virtuous citizens."  *Id.* at 1184.

Post-*Bruen*, however, the Fifth Circuit has held that § 922(g)(8) "falls outside the class of firearm regulations countenanced by the Second Amendment."  *United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240, at *10 (5th Cir. Feb. 2, 2023).  Although the panel stated that the statute "embodies salutary policy goals meant to protect vulnerable people in our society," it noted that "*Bruen* forecloses any such analysis in favor of a historical analogical inquiry into the scope of the allowable burden on the Second Amendment right."  *Id*.  Accordingly, the court concluded that § 922(g)(8) "is an 'outlier[] that our ancestors would never have accepted.'"  *Id*. (quoting *Bruen*, 142 S. Ct. at 2133).

Notably, the Fifth Circuit characterized as "*significant* that § 922(g)(8) works to eliminate the Second Amendment right of individuals subject *merely* to a civil process." *Rahimi*, 2023 WL 1459240, at *6 n.6 (emphasis added).  In contrast, the statute at issue here pertains to a criminal proceeding.

The government contends that § 922(n) is "consistent with the longstanding tradition of restricting the [gun] rights . . . of those charged with serious crimes." ECF 37 at 10.  In particular, it states, *id*. at 10-11: "The government has always been able to impose 'substantial liberty restrictions' on indicted defendants (including detention or, alternatively, conditions of pretrial release) when needed to promote 'the operation of our criminal justice system.'" (quoting *Salerno*, 481 U.S. at 749).

In *Salerno*, 481 U.S. at 754-55, the Supreme Court concluded that pretrial detention under the Bail Reform Act based on dangerousness violates neither the right to due process under the Fifth Amendment nor the Eighth Amendment prohibition of excessive bail.  The Court collected circumstances under which an individual's Fifth Amendment liberties yield to "the government's regulatory interest in community safety," explaining that "[e]ven competent adults may face substantial liberty restrictions as a result of the operation of our criminal justice system."  *Id*. at 748-49.  The Court concluded that detaining defendants was a valid exercise of "the well-established authority of the government, in special circumstances, to restrain individuals' liberty prior to or even without a criminal trial and conviction."  *Id.* at 749.

In addition, the government points to 18 U.S.C. § 3142(c)(1)(B)(viii), which allows a federal court to order a person on federal pretrial release to "refrain from possessing a firearm, destructive device, or other dangerous weapon" if needed to "reasonably assure the appearance of the person as required and the safety of any other person and the community." ECF 37 at 11.  And, post-*Bruen*, several courts have upheld the statute's disarmament provision as a condition of release for persons charged with federal offenses.

For example, in *United States v. Slye*, RAL-22-144, 2022 WL 9728732, at *2 (W.D. Penn. Oct. 6, 2022), the Western District of Pennsylvania rejected a Second Amendment challenge to

§ 3142(c)(1)(B)(viii), explaining that "[i]t would be illogical to conclude" that a court has the authority to detain an indicted defendant, thus denying him many constitutional rights, "but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction."  And, "[g]iven the long-standing precedent for denial of pretrial release and its attendant right to possess firearms," the court ruled that § 3142(c)(1)(B)(viii) squares with historical tradition.  *Id*. at *3; *see also Fencl*, 2022 WL 17486363, at *3 (upholding § 3142(c)(1)(B)(viii) based partly on "this Nation's historical tradition of pretrial detention (and its attendant restrictions on an individual's Second Amendment rights)").

The government also likens § 922(n) to "the surety laws discussed in *Bruen*."  ECF 37 at 11.  "The surety statutes generally provided that an individual's Second Amendment right 'could be burdened only if another could make out a specific showing of reasonable cause to fear an injury, or breach of the peace.'"  *Kays*, 2022 WL 3718519, at *4 (quoting *Bruen*, 142 S. Ct. at 2148).

In *Kays*, 2022 WL 3718519, at *5, a judge in the Western District of Oklahoma concluded that § 922(n) is facially constitutional.  He found that "a historical analogue to § 922(n) does exist in the form of the surety statutes discussed in *Bruen*."  *Id*. at *4 ("These statutes can be traced to the mid-19th century . . . .  Although these laws were not 'bans on public carry,' they did restrict it.").  The court said: "Like the surety statutes, § 922(n) is faithful to the notion that individuals have a right to bear arms . . . .  Similarly, § 922(n) only burdens an individual's Second Amendment rights 'during the pendency of the indictment, a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or others.'"  *Id*. (quoting *United States v. Khatib*, AEG-12-190, 2012 WL 6086862, at *4 (E.D. Wis. Dec. 6, 2012)).

In other words, the court found the surety laws apt because, unlike the licensing scheme challenged in *Bruen*, which restricted every citizen, § 922(n) only burdened those under indictment.  Additionally, the court noted that "§ 922(n) is arguably less restrictive than the surety laws discussed, as the surety laws required those 'reasonably accused' to 'show a special need in order to avoid positing a bond' before carrying.  *Kays*, 2022 WL 3718519, at *5 (quoting *Bruen*, 142 S. Ct. at 2149).

A judge in the Middle District of Tennessee also found § 922(n) constitutional under *Bruen*, and similarly underscored the temporary nature of the restriction imposed by the statute, which "'lasts only from indictment to conviction or acquittal.'"  *Kelly,* 2022 WL 17336578, at *5 (quoting *Laurent*, 861 F. Supp. 2d at 102).  The court pointed out that § 922(n) is "specifically tied to the administration of justice, an area in which individuals 'may face substantial liberty restrictions,' at least for limited periods of time, in the name of maintaining integrity and functioning of the relevant proceedings." *Kelly*, 2022 WL 17336578, at *6 (quoting *Salerno*, 481 U.S. at 749).  And, the court in *Kelly* "followed the Supreme Court's lead" in *Bruen* and assumed that § 922(n) is "less constitutionally suspect because it relies on objective criteria rather than government discretion." *Kelly*, 2022 WL 17336578, at *5.  Accordingly, the court found that § 922(n) squares with "the common law tradition of gun regulation permit[ing] the disarming of certain classes of individuals based on questions regarding whether those individuals had been peaceable and/or law-abiding." *Id*. (quotation marks omitted).

*Rowson*, 2023 WL 431037, was decided shortly after oral argument in this case.  There, a judge in the Southern District of New York relied on *Kays* and *Kelly* to uphold the constitutionality of § 922(n).  *Id.* at *21.

In particular, the *Rowson* Court compared the statute to the long line of laws of disarming persons perceived dangerous and noted that "Section 922(n) imposes a partial limit on the firearms rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness: an indictment for a felony punishable by a year or more in prison." *Id*. at *22.  It also observed that "the burden § 922(n) imposes is limited in scope (barring the indictee from shipping, transporting, or receiving firearms, but not from possessing them) and time (expiring upon the disposition of the indictment)." *Id*.  When comparing the statute to surety laws, the court highlighted that "Section 922(n) similarly applies only to a subset of persons—felony indictees— as to whom probable cause has been found . . . to have committed a serious crime." *Id*. at *23.  Moreover, just as "some surety laws permitted the accused to reclaim their firearm on the posting of a bond or showing of self-defense," § 922(n) also "embeds its own mechanism for relief: resolution of the pending indictment (whether by dismissal, plea, acquittal, or conviction)." *Id*. at *24.

Two other district court opinions, issued just days ago, have held § 922(n) constitutional.  In *Gore*, 2023 WL 2141032, at *4, a judge in the Southern District of Ohio analogized the statute to surety laws and held that § 922(n) is facially valid under the Second Amendment because it "imposes a comparable burden and has a comparable justification to historical surety laws."  And, in *Bartucci*, 2023 WL 2189530, at *10, a judge in the Eastern District of California also compared § 922(n) to surety laws and concluded that "although Section 922(n) may not be a 'dead ringer for historical precursors,' . . . it is sufficiently analogous to pass constitutional muster."  (Quoting *Bruen*, 142 S. Ct. at 2148).  It also found that the "colonial and revolutionary-era laws that disarmed groups of people perceived as per se dangerous are 'sufficiently relevant' analogies to Section 922(n)." *Id*. at *8.

Conversely, defendant points to the decisions that have found § 922(n) unconstitutional in the aftermath of *Bruen*. *See* ECF 34 at 16-18; ECF 39 at 4, 12, 13, 18, 19; ECF 53. For instance, a judge in the Northern District of Indiana found that "§ 922(n) is meaningfully different than surety laws, so surety laws don't provide the historical support needed to sustain § 922(n)." *Holden*, 2022 WL 17103509, at *4. Specifically, that court concluded that § 922(n) imposes an absolute prohibition on firearm possession while, under surety laws, "the regulated person could bear a firearm if he had an individualized need for self-defense or if he posted a bond." *Id*. In *Reaves*, HEA-22-224, ECF 55 at 20, a judge in the Eastern District of Montana was "persuaded by [this] reasoning" when holding that the surety laws "do not provide the necessary historical reference that would allow § 922(n) to withstand a constitutional challenge under the *Bruen* framework."

In *Quiroz*, 2022 WL 4352482, at *8, a judge in the Western District of Texas said: "Rather than completely restrict the accused's constitutional right, surety laws permitted the accused to prove a special self-defense need." Thus, he found that the existence of surety laws provided evidence that "§ 922(n) departs from this Nation's historical tradition of firearm regulation." *Id*. And in *Hicks*, 2023 WL 164170, at *7, another judge in the same district agreed with the "sister court in *Quiroz* and other district courts that have held § 922(n) to be unconstitutional."

In *Stambaugh*, 2022 WL 16936043, at *5, a judge in the Western District of Oklahoma determined that surety laws "are fundamentally different from § 922(n) in substance, burden, and process." Notably, he did not mention his colleague's opinion in *Kays*, 2022 WL 3718519, at *5, which, as discussed above, found that the surety laws provided sufficient analogue to § 922(n).

Thus, even within the same district, federal courts are fractured when it comes to analyzing § 922(n) under *Bruen*. The court in *Kelly* characterized this divide as "different judgment calls on

reasonably contestable, highly abstract questions of historical analogy." 2022 WL 17336578, at *5. Perhaps a split is to be expected, as "many aspects of the history of firearms and their regulation are ambiguous, contradictory, or disputed." *Bruen*, 142 S. Ct. at 2180 (Breyer, J., dissenting).

On balance, this Court is persuaded by the historical analysis provided by the government. Clearly, "[r]egulations limiting or prohibiting access to firearms by specific groups in the interest of public safety have been part of the Nation's historical tradition since the earliest days of our Nation's founding." *Perez-Garcia,* 2022 WL 4351967, at *6; *see also National Rifle,* 700 F.3d at 200 ("In the view of at least some members of the founding generation, disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally."); Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations, 60 HASTINGS L.J. 1339, 1360 (2009) ("[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms. American legislators at the time of the Bill of Rights seem to have been aware of this tradition of excluding criminals and other suspect persons from the right to arms."). Furthermore, a felony indictment serves as a uniform and "objective criteria" to restrict access to firearms. *Kelly*, 2022 WL 17226578, at *5; *see Rowson*, 2023 WL 431037, at *22 ("Section 922(n) imposes a partial limit on the firearms rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness: an indictment for a felony punishable by a year or more in prison."); *see also Bartucci*, 2023 WL 2189530, at *8.

Moreover, the historical tradition of sometimes detaining defendants charged with serious crimes supports restricting their Second Amendment rights while under indictment. As discussed, a felony indictment already allows for a range of liberty restrictions, despite constitutional rights.

For instance, it may lead to pretrial detention, which obviously strips a defendant of all Second Amendment rights and severely limits many other "core constitutional rights," such as freedom of speech, freedom of association, and reasonable privacy expectations. *See Slye*, 2022 WL 9728732, at *2 & n.4.[11]  And, an indictment may trigger the seizure of assets, *see Kaley*, 571 U.S. at 327-28.

Critically, § 922(n) does not entirely restrict an individual's Second Amendment rights, as it does not bar possession of a firearm.  Rather, the statute is a narrow restriction that prohibits transporting and "obtaining new weapons during the period of time in which a person is the subject of an active felony prosecution." *Kelly*, 2022 WL 17336578, at *6.  If an indictment is constitutionally sufficient to trigger a complete prohibition on a defendant's Second Amendment rights, because of pre-trial detention, then it must also be sufficient to temporarily restrict the right to acquire or transport arms while a felony indictment is pending.

In addition, a restriction on the receipt of firearms by persons who are indicted comports with the two metrics advanced in *Bruen*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133.  Both surety statutes and pretrial release restrictions operate to limit the rights of a discrete group of people, and not the public generally. They also both allow such restrictions for the purpose of public safety.  As the court in *Kelly* noted, 2022 WL 17336578, at *6, "[e]ven in a world in which the right to bear arms is zealously protected, it is not difficult to imagine why the government might have a particular, narrowly acceptable interest in preventing an individual from amassing a fresh arsenal while the proceedings that might

_____

[11] *Bruen* announced that its "Second Amendment standard accords with how [the Court] protect[s] other constitutional rights."  142 S. Ct. at 2130 (comparing the Second Amendment to the First and Fourth Amendments); *see also id*. at 2137, 2157 (comparing the Second Amendment to the First and Sixth Amendments).  *Heller*, too, "repeatedly compared the right to keep and bear arms" to the First Amendment, *id*. at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634-635), as well as the Fourth Amendment.  *See Heller*, 554 U.S. at 579, 582, 592.

ultimately end in his imprisonment are ongoing."  And, this Court is persuaded by the historical analyses that have found that legislatures traditionally had both the "authority and broad discretion to determine when individuals' status or conduct evinced such a threat sufficient to warrant disarmament." *Range*, 53 F.4th, at 282.

In particular, because § 922(n) restricts access to firearms as to persons accused by a grand jury, and is consistent with laws such as surety laws, this Court finds no constitutionally fatal infirmity in the fact that it deviates from those laws in some specifics.  *See Rowson,* 2023 WL 431037, at *24 ("the surety laws, though an imperfect match, are informative and viable analogues"); *see also Bruen*, S. Ct. at 2133 ("So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."); *Kelly*, 2022 WL 1733658, at *5 n.7 ("This court . . . is more persuaded by the reading of *Bruen* that focuses not on a minutely precise analogy to historical prohibitions, but rather an evaluation of the challenged law in light of the broader attitudes and assumptions demonstrated by those historical prohibitions.").  Accordingly, the government's reliance on these laws is sufficient to satisfy its burden to justify the firearm regulation of § 922(n).  The Court declines to hold that, on its face, the statute violates the Second Amendment.

As noted, defendant also argues that "[i]f the Court concludes § 922(n) is facially constitutional because it tracks a supposed historical tradition of disarming 'dangerous' and 'unvirtuous' groups,[] the Court should nevertheless hold the statute violates the Second Amendment as applied to Mr. Jackson, who is neither dangerous nor unvirtuous."  ECF 34 at 29.  In particular, defendant notes that his Arizona Indictment was ultimately "dismissed in its entirety on May 24, 2022, by motion of the prosecution."  *Id*.  However, the analysis the Court has applied above is not contingent on whether defendant was convicted.  After all, surety laws were "intended

merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 252 (1769).  And, as discussed, restricting access to firearms for persons who are indicted with a felony is consistent with the Nation's historical traditional.  Therefore, defendant's as-applied challenge also fails.

### III. Conclusion

In sum, I am satisfied that the restriction on receiving or transporting firearms while under a felony indictment is consistent with the Nation's historical tradition of regulating firearms. Accordingly, this Court holds that § 922(n) does not violate the Second Amendment.

For the reasons stated above, I shall deny defendant's "Motion to Dismiss the Indictment Under the Second Amendment" (ECF 34).  An Order follows, consistent with this Memorandum Opinion.

Date: February 27, 2023                                        _____/s/_____
                                                                          Ellen L.  Hollander
                                                                          United States District Judge